[Civ. No. 66755. Second Dist., Div. Seven. Oct. 3, 1983.]

TIMOTHY CURRAN, Plaintiff and Appellant, v.
MOUNT DIABLO COUNCIL OF THE BOY SCOUTS OF AMERICA,
Defendant and Respondent.

**COUNSEL**

Fred Oakrand, Susan McGreivy, Barry Copilow and George Slaff for Plaintiff and Appellant.

Hughes, Hubbard & Reed, Malcolm E. Wheeler and Carol A. Chase for Defendant and Respondent.

William M. Crosby as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**THOMPSON, J.**—In this case we are called upon to determine whether the expulsion of a person from membership in the Boy Scouts on the basis of his homosexuality constitutes a violation of both the common law right of fair procedure and the Unruh Civil Rights Act (Civ. Code, § 51). We have determined that using the status of homosexuality as a basis of expulsion is substantively arbitrary and therefore violative of the common law right of fair procedure. Moreover, before homosexuality may lawfully be used as a basis to expel, a rational connection must be demonstrated between homosexual conduct and any significant danger of harm to the association resulting from the continued membership of the homosexual person. We have further determined that the Boy Scouts is a business establishment within the meaning of the Unruh Act and is therefore prohibited from all discrimination in the provision of its services. Accordingly, we have concluded the

trial court improperly sustained the general demurrer without leave to amend and the judgment of dismissal in favor of defendant should be reversed.

## FACTS AND PROCEEDINGS BELOW

Plaintiff Timothy Curran filed an amended complaint and petition for writ of mandate (complaint), containing two causes of action against defendant Mount Diablo Council of the Boy Scouts of America. The gist of the first cause of action is that plaintiff's expulsion from, and rejection as "Scouter" by, the Boy Scouts of America, were based not only on an unfair procedure but also on an improper reason, plaintiff's sexual preference of homosexuality. The second cause of action is for violation of plaintiff's rights under the Unruh Civil Rights Act.

From the allegations of the first cause of action of the complaint the following facts emerge. Defendant is part of the Boy Scouts of America, a congressionally-chartered corporation (36 U.S.C.A. §§ 21-29). Plaintiff was a member of defendant in good standing for over five years immediately prior to November 28, 1980, and had attained the rank of eagle scout. Prior to November 28, 1980, plaintiff had submitted his application to defendant to become a "Scouter" of the Boy Scouts of America. Such an application by an eagle scout is routinely and uniformly approved by defendant. On November 28, 1980, Quentin Alexander, scout executive of defendant and acting on its behalf, informed plaintiff that plaintiff was no longer a member of the Boy Scouts of America and could not have "Scouter" status because plaintiff was a homosexual and hence not a good moral example for younger scouts.

Prior to his expulsion and rejection plaintiff was not given notice or a fair opportunity to be heard. After his expulsion and rejection, plaintiff made written request to the western region of the Boy Scouts of America, of which defendant is a subordinate body, for an administrative review of defendant's decision. Defendant advised plaintiff that such a review would not be productive unless in fact plaintiff was not a homosexual. No other administrative remedy is available and, as a consequence thereof, all administrative remedies were exhausted.

Plaintiff further alleges in the first cause of action that membership in the Boy Scouts of America is of considerable financial value to its members in admission to institutions of higher learning, in employment, and in advancement in the business world.

In the second cause of action of his complaint, plaintiff incorporates all the allegations of the first cause of action. Plaintiff further alleges inter alia that the Boy Scouts of America is the owner of the copyright of the Boy Scouts' emblem and uniform, which are franchised to retail outlets throughout the United States. It derives great financial revenues from such franchising. In addition, the Boy Scouts of America is engaged in the book publishing business and publishes and sells a variety of books throughout the United States. Furthermore, defendant maintains a retail shop in Walnut Creek, California, where it engages in extensive commercial activities.

In addition to mandamus seeking plaintiff's reinstatement in defendant and attainment of "Scouter" status, the complaint seeks a permanent injunction barring defendant from interfering with plaintiff's rights under the Unruh Civil Rights Act and for damages.

This appeal raises the following issues:

(1) Does the first cause of action state a valid claim for wrongful denial of the common law right of "fair procedure"?

(2) Does the second cause of action state facts showing a violation of the Unruh Civil Rights Act (Civ. Code, § 51) in that (a) the Boy Scouts is a "business establishment" within the meaning of the Unruh Act and (b) plaintiff's expulsion or exclusion from defendant on the basis of his sexual preference of homosexuality, which deprives him of defendant's services, constitute a violation of the Unruh Act?

Our task on this appeal was stated by our Supreme Court in *Glaire v. La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357]: "Our only concern in this case is whether plaintiff has succeeded in stating a cause of action. In assessing the sufficiency of a complaint against a general demurrer, we must treat the demurrer as admitting all material facts properly pleaded. [Citations omitted.] Furthermore, we bear in mind our well established policy of liberality in reviewing a demurrer sustained without leave to amend: 'the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties.'"

I

THE FIRST CAUSE OF ACTION STATES A VALID CLAIM FOR WRONGFUL DENIAL OF THE COMMON LAW RIGHT OF FAIR PROCEDURE.

Plaintiff argues that defendant's action in expelling him from membership in the Boy Scouts of America and in denying him "Scouter" status on the

basis of his sexual preference of homosexuality was both substantively irrational and procedurally unfair.

■ Under common law, relief was afforded to any individual expelled from a private association who could demonstrate (1) that the society's rules or proceedings were contrary to "natural justice," (2) that the society had not followed its own procedures, or (3) that the expulsion was maliciously motivated. (*Dawkins* v. *Antrobus* (1881) 17 Ch.D. 615; see Chafee, *The Internal Affairs of Associations Not For Profit* (1930) 43 Harv. L.Rev. 993, 1014-1020.)

This common law principle authorizing judicial review of expulsions from associations became part of California law before the turn of the century. (See *Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308 [17 P. 217].) Since then, this common law principle has been reiterated in an unbroken line of California decisions. (See, e.g., *Von Arx* v. *San Francisco G. Verein* (1896) 113 Cal.377 [45 P. 685]; *Taboada* v. *Sociedad Espanola etc.* (1923) 191 Cal. 187, 191-192 [215 P. 673, 27 A.L.R. 1508]; *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440, 443-444 [120 P. 79]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6]; *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550-553 [116 Cal.Rptr. 245, 526 P.2d 253]; *Ezekial* v. *Winkley* (1977) 20 Cal.3d 267 [142 Cal.Rptr. 418, 572 P.2d 32]; *Hackethal* v. *California Medical Assn.* (1982) 138 Cal.App.3d 435 [187 Cal.Rptr. 811].)

■ Taken together, these decisions establish that the expulsion of a person from membership in a private unincorporated association is deemed "arbitrary" and in violation of the common law right of fair procedure when the expulsion is substantively unreasonable, internally irregular, or procedurally unfair. (*Ezekial* v. *Winkley, supra,* 20 Cal.3d at p. 272.) Procedural fairness requires "adequate notice of the 'charges' . . . [and] a reasonable opportunity to respond." (*Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d at p. 555.) Furthermore, an expulsion cannot properly rest on a rule which is substantively capricious or contrary to public policy. (*Id.,* at p. 553).

In applying this common law protection against arbitrary expulsion, the courts use a two-step analysis. First, a judicial evaluation of the procedure followed by the association is made to determine if the procedure is fair. For example, in *Hackethal* v. *California Medical Assn., supra,* 138 Cal.App.3d 435, which involved an action by an expelled member of a county medical society seeking reinstatement, the court held the society's proceedings did not meet common law standards of fair procedure. The

court found that the society held hearings outside the presence of the expelled member and his counsel, denied the expelled member access to documentary evidence forming the basis of the charges, and used a standard of proof contrary to its bylaws.

Secondly, judicial inquiry is made to determine whether the expulsion rests upon a rule which is substantively capricious or contrary to public policy. For example, in *Bernstein* v. *Alameda etc. Medical Assn.* (1956) 139 Cal.App.2d 241 [293 P.2d 862], the court held that a medical society could not lawfully expel a doctor for making disparaging statements about another doctor's professional work in the course of legal proceedings.

Defendant contends that plaintiff does not come within the ambit of this common law principle because there are no allegations showing plaintiff was divested of any vested right in specific property, which this principle requires for its application. Defendant cites *Otto* v. *Tailors' P. & B. Union, supra,* 75 Cal. 308, *Von Arx* v. *San Francisco G. Verein, supra,* 113 Cal. 377, *Taboada* v. *Sociedad Espanola, supra,* 191 Cal. 187, and *Grand Grove A. O. of D.* v. *Duchein* (1894) 105 Cal. 219 [38 P. 947], in support of its argument. Defendant argues that in each of these cases the court intervened to prevent a private association from unjustly enriching itself by depriving a member of his share of the property of an association through an unfair expulsion.

While a superficial reading of these cases might suggest that defendant's restrictive interpretation has some support, this attempt to confine these cases to such a narrow base ignores recent development in this area of the law. In *Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, our Supreme Court gave these cases a broader construction. The court stated: "The underlying theme of these decisions, variously stated, is that *membership in an association, with its associated privileges, once attained, is a valuable interest which cannot be arbitrarily withdrawn.* Thus, they comport with the broader principle that one on whom an important benefit or privilege has already been conferred may enjoy legal protection not available to an initial applicant for the same benefit." (*Id.,* at p. 273; italics added.)

In this case, plaintiff alleges two important benefits which are entitled to legal protection. First, he was a member in good standing of the Boy Scouts at the time of his expulsion. Secondly, he had attained the rank of eagle scout, which ensures routine promotion to the status of "Scouter."

Defendant, however, contends that this is not an expulsion case, but rather a case involving an exclusion from membership in a private association.

Defendant argues that plaintiff was a Boy Scout until October 28, 1979, when he became 18 years of age. Defendant urges this court to take judicial notice of article VII, section 3 of the rules and regulations of the Boy Scouts of America. (See *Young* v. *Boy Scouts of America* (1935) 9 Cal.App.2d 760, 764 [51 P.2d 191].) Defendant argues that this section provides that a boy may be a Boy Scout until he is eighteen years old. Thus, plaintiff was not a member on November 28, 1980, the date of his alleged expulsion from the Boy Scouts. Defendant argues that this case therefore turns on the applicability of the narrower principles in the *Marinship-Pinsker*[1] cases, prohibiting arbitrary exclusions from membership in private associations which "possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced." (*Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, 272.)

■ "On demurrer, it is not the function of a trial court, or of this court, to speculate on the ability of a plaintiff to support, at trial, allegations well pleaded." (*Meyer* v. *Graphic Arts International Union* (1979) 88 Cal.App.3d 176, 179 [151 Cal.Rptr. 597].) Plaintiff's allegations must be accepted as true for the purpose of ruling on a demurrer, unless they contradict or are inconsistent with facts judicially noticed by the court. (*Saltares* v. *Kristovich* (1970) 6 Cal.App.3d 504, 510 [85 Cal.Rptr. 866].)

■ We have taken judicial notice of this section, which provides: "A Boy Scout is a boy who has completed the fifth grade and is at least 10½ years of age or older and in either case is not yet 18 who . . . becomes a registered member of a Boy Scout troop. . . ." A reasonable construction of this section is that a boy must join the Boy Scouts before reaching the age of 18.[2] Thus, there would be neither a contradiction nor inconsistency between the allegation that plaintiff was a member in good standing of the Boy Scouts, and the facts judicially noticed. We conclude, therefore, that this is an expulsion, rather than an exclusion, case under the allegations of the first cause of action. Hence, the determination of whether a cause of action is stated turns on the application of the "*broader principle*" applicable to "an important benefit or privilege [that] has already been conferred." (*Ezekial* v. *Winkley, supra,* 20 Cal.3d 267, 273, italics added.)

---

[1] *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900]; *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] (*Pinsker I*); and *Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d 541 (*Pinsker II*).)

[2] This section has a patent ambiguity and thus, within the policy of liberality governing our review, we give this section a broad construction. At trial, extraneous evidence may be necessary.

■ We now turn to whether the first cause of action states a valid claim for wrongful denial of the common law right of fair procedure. Here, the complaint alleges that, without notice or an opportunity to respond, plaintiff was expelled from the Boy Scouts on the ground he was a homosexual and hence, not a good moral example for younger scouts.

Based on a reasonable construction of these allegations, we find that an expulsion from a private association under such circumstances is both procedurally unfair and substantively unreasonable.

First, the elements of adequate notice of charge and reasonable opportunity to respond are basic to common law fair procedure. (*Hackethal* v. *California Medical Assn.*, *supra*, 138 Cal.App.3d at p. 442.)

Secondly, an expulsion from an association on the basis of a person's status of homosexuality is both capricious and offensive to public policy. The mere status of homosexuality without more does not connote immorality. In *Stoumen* v. *Reilly* (1951) 37 Cal.2d 713 [234 P.2d 969], the liquor license of the plaintiff had been revoked because he was found to have conducted a disorderly house in violation of section 58 of the Alcoholic Beverage Contract Act.[3] The violation was based on the licensing board's finding that " 'persons of known homosexual tendencies patronized said premises and used said premises as a meeting place.' " (*Id.*, at p. 715.) Our Supreme Court reversed, saying that no evidence of any illegal or immoral conduct on the premises had been shown: "[S]omething more must be shown than that many of his patrons were homosexuals and that they used his restaurant and bar as a meeting place." (*Id.*, at p. 717.)

In addition, inhibiting association members' public and civic rights is contrary to public policy. (See *Mitchell* v. *Internat. Assn. of Machinists* (1961) 196 Cal.App.2d 796, 804 [16 Cal.Rptr. 813]; *Zelenka* v. *Benevolent & Protective Order of Elks* (1974) 129 N.J. Super. 379 [324 A.2d 35, 37-38]; Note, *Developments in the Law-Judicial Control of Actions of Private Associations* (1963) 76 Harv.L.Rev. 983, 1006.) Although some people's ideal of human adjustment is unconditional conformity, the genius of American pluralistic society has been its ability to accept diversity and differences. An appeal to this genius in the espousal of a cause and some

---

[3]Section 58 provided: "Every licensee or agent or employee of any licensee who keeps or permits to be used or suffers to be used, in conjunction with a licensed premises, any disorderly house or place in which people abide or to which people resort, to the disturbance of the neighborhood, or in which people abide or to which people resort for purposes which are injurious to the public morals, health, convenience or safety shall be guilty of a misdemeanor."

degree of action to promote the acceptance thereof by other persons is "political activity." (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 487 [156 Cal.Rptr. 14, 595 P.2d 592].) Thus, the struggle of the homosexual community for equal rights is recognized as political activity. (*Id.,* at p. 488.) "[O]ne important aspect of the struggle for equal rights is to induce homosexual individuals to 'come out of the closet,' and acknowledge their sexual preferences, and to associate with others in working for equal rights." (*Ibid.*)[4]

The essence of this right was expressed in *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 250-251 [1 L.Ed.2d 1311, 1325, 77 S.Ct. 1203]: "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. . . . History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted . . . . The absence of such voices would be a symptom of grave illness in our society."

In the instant case the allegations can reasonably be construed as charging that defendant's action to expel rests on plaintiff's political decision to "come out of the closet" and acknowledge his sexual preference of homosexuality. As so construed, the expulsion would be distinctly contrary to public policy. (Cf. *Bernstein* v. *Alameda, etc. Medical Assn., supra,* 139 Cal.App.2d 241, 246.)

On the other hand, if defendant's action to expel is based on plaintiff's homosexual conduct, then plaintiff's right of freedom of expression is qualified with respect to his participation in the activities of defendant. In this context, the association's natural right of self-preservation comes into play. (See *Davis* v. *Int. Alliance etc. Employees* (1943) 60 Cal.App.2d 713, 715 [141 Cal.Rptr. 486].) However, since plaintiff's role in defendant is analogous to a school teacher's, the standard used in *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375] (involving private, noncriminal homosexual conduct) and *Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691 [139 Cal.Rptr. 700, 566 P.2d 602] (involving public, criminal homosexual conduct) in connection with the revocation of teaching credentials and dismissals can be applied here. Taken together, these cases hold that a teacher should not be dismissed or lose his

---

[4]Twenty-one states, including California, have decriminalized private, consensual adult homosexual sexual acts. (See Rivera, *Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States* (1979) 30 Hastings L.J., 799, 950-951; Cal. Pen. Code, §§ 286, 288a.)

license, even where the person has engaged in homosexual conduct, unless his unfitness to teach can be demonstrated.

Justice Tobriner, writing for the majority in each case, specified that the factors which may be considered in making such a determination are "the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 229.) The applicable factors should be used in the instant case to determine if there is a rational nexus between plaintiff's homosexual conduct, if any, and harm to the Boy Scouts resulting from his continued membership.

Applying this *Morrison* standard to the instant case, we hold that, before homosexual conduct, whether private or public, criminal or noncriminal, may lawfully be used as a basis to expel plaintiff from membership in defendant, a connection must be demonstrated between his homosexual conduct and any significant danger of harm (*id.,* at p. 235) to the association resulting from his continued membership.

For the foregoing reasons, we hold that plaintiff has stated a valid claim for wrongful denial of the common law right of fair procedure in his first cause of action.

II

## VIOLATION OF THE UNRUH CIVIL RIGHTS ACT IS STATED

Plaintiff further contends that either his expulsion or exclusion from defendant on the basis of his sexual preference of homosexuality deprives him of defendant's services and thus, violates the Unruh Civil Rights Act (Civ. Code, § 51).

The Unruh Act provides in part: "All persons within the jurisdiction of this State are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal ac-

commodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51.)[5]

## A. The Historical Perspective of the Unruh Act

To put the present inquiry into its proper historical perspective, our analysis must begin with an exploration of the development of public accommodation laws in California.

Under California's early common law, enterprises which were affected with a public interest had a duty to provide service to all without discrimination. (*In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992].) In 1897, statutory recognition was given to this common law doctrine by the enactment of the predecessor of the present Unruh Act. (*Id.*, at p. 213.)[6] This 1897 act was "similar to statutes enacted during the same periods by a number of states. The immediate impetus for enactment of these statutes by the states was the holding of the United States Supreme Court in the Civil Rights Cases [(1883) 109 U.S. 3 (27 L.Ed. 835, 3 S.Ct. 18)] that the federal government had no constitutional power to enact such a statute." (See Horowitz, *The 1959 California Equal Rights In "Business Establishments" Statute—A Problem In Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 277.)

From 1897 until 1959, when Unruh was enacted, the language of the public accommodation statute was amended on several occasions, with the Legislature listing additional specific places of public accommodation but always including the general category of "all other places of public accommodation or amusement." (See Stats. 1919, ch. 210, § 1, p. 309, and Stats. 1923, ch. 235, § 1, p. 485.) Despite the broad language forbidding discrimination by "all other places of public accommodation," certain decisions of appellate courts made in the late 1950's reveal a judicial effort to "improperly" curtail "the scope of the public accommodation provisions" by narrowly defining the kinds of businesses that afforded public accommodation. (See *In re Cox, supra,* 3 Cal.3d at p. 214.) For example, in *Long* v. *Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328, 329 [278 Cal.Rptr. 945], the court held "the expression 'all other places' means all other places

---

[5]Section 51 of the Civil Code provides that it shall be known as the "Unruh Civil Rights Act."

[6]The 1897 act provided: "That all citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities, privileges of inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and *all other places of public accommodation or amusements,* subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1897, ch. 108, § 1, p. 137; italics added.)

of a like nature to those enumerated," and therefore found the association's white-only policy to be lawful. Similarly, in *Coleman* v. *Middlestaff* (1957) 147 Cal.App.2d Supp. 833, 834-835 [305 P.2d 1020], the court said, "We do not consider that a dentist's office is a place of like nature to those enumerated," and permitted a dentist to refuse service to a black patient. Finally, in *Reed* v. *Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887, 890 [338 P.2d 633], the court held "a private school is not a place of public accommodation" and could therefore exclude black students.

Out of a concern for, and in response to, these decisions restricting the scope of the public accommodations provisions, the Legislature in 1959 enacted the Unruh Act, which provided in part: " 'All citizens . . . are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.´ ' "[7] (*In re Cox, supra,* 3 Cal.3d at p. 214.)

B. "BUSINESS ESTABLISHMENTS" INCLUDE ALL ENTITIES, WHETHER CARRIED ON FOR PROFIT OR NOT, WHICH ARE OPEN TO AND SERVING THE GENERAL PUBLIC

With this historical perspective in mind, we are called upon to determine whether the Boy Scouts, of which the defendant is a part, comes within the meaning of the statutory phrase "all business establishments of every kind whatsoever."

As with all statutes the Unruh Act must be construed in the light of its legislative purpose and design. (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].) Moreover, in enforcing the command of the Unruh Act, both the policy expressed in its terms, and the object implicit in its history and background should be recognized. (*Winchell* v. *English* (1976) 62 Cal.App.3d 125, 128 [133 Cal.Rptr. 20].) Furthermore, since the Unruh Act is remedial in nature, it is to be given a liberal construction "with a view to effect its object and to promote justice." (*Ibid.*)

The first step in our analysis is to determine the intended meaning of the word "business" as used by the Legislature.

Our Supreme Court considered the meaning of the word "business" in *Marin Municipal Water Dist.* v. *Chenu* (1922) 188 Cal. 734 [207 P. 251].

---

[7]The Legislature in 1961 substituted "all persons" for "all citizens," and in 1974, added "sex." These amendments broaden the applicability of section 51.

There, the Supreme Court stated: "The general definition of the word [business] is 'that which busies, or engages time, attention, or labor, as a principal serious concern or interest,' but the word has a narrower meaning applicable to occupation or employment for livelihood or gain and to mercantile or commercial enterprises or transactions." (*Id.*, at p. 738.) Thus, the word "business" has a broad as well as narrow meaning.

Defendant argues that, by expressly limiting the Unruh Act to "business establishments," the intent of the Legislature was to confine its application to commercial enterprises and activities under the *narrow* meaning of business. Hence, nonprofit and charitable organizations like the Boy Scouts are outside the scope of the statute. Moreover, the defendant argues that the definition of "business" given in *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313], and repeated with approval in *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795 [191 Cal.Rptr. 320, 662 P.2d 427], supports this position. We disagree.

Our examination of *Burks* reveals that the Supreme Court determined the Legislature intended the word "business" as used in the Unruh Act to reflect both a broad meaning to include noncommercial entities as well as a narrow meaning to include commercial entities.

First, the Supreme Court determined that the Unruh Act was adopted to *include* the prohibition against discrimination in places of public accommodation or amusement as provided by earlier common law and statutory public accommodations provisions as well as to *extend* the prohibition against discrimination to " 'all business establishments.' " (*Id.*, at p. 471.)

Secondly, the Supreme Court implicitly presumed that the Legislature in enacting a statute such as the Unruh Act was familiar with both the relevant rules of statutory construction governing remedial legislation and prior judicial interpretation of particular words. ▉ Thus, when it couches its enactment of a remedial statute in such words without exception, the Legislature intends its broadest application. (*Id.*, at p. 468; see, e.g., *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 625 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

▉ Thirdly, in determining the meaning of the word "business" as intended by the Legislature, the Supreme Court cited and relied on *Mansfield v. Hyde* (1952) 112 Cal.App.2d 133, 137 [245 P.2d 577] (57 Cal.2d at p. 468), which in turn cited and relied on *Marin Municipal Water Dist. v. Chenu, supra,* 188 Cal. 734, 738. In *Mansfield,* the court stated: " 'Business' in its *broad* sense embraces everything about which one can be em-

ployed; the word is often synonymous with a calling, occupation, or trade, engaged in for the purpose of obtaining a livelihood or profit or gain. [Citation.]" (112 Cal.App.2d at pp. 137-138; italics added.) That the *Mansfield* court defines business in both its broad as well as narrow meaning cannot be disputed. This is also true in *Burks*, where the Supreme Court stated: "The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.' [Citations.]" (57 Cal.2d at p. 468.)

Fourthly, the Supreme Court determined that "[t]he word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' *or 'a permanent settled position (as in life or business).'*" (*Id.*, at pp. 468-469; italics added.) It goes without saying that the latter part refers to a noncommercial organization.

Finally, the Supreme Court determined that the use of the words "all" and "of every kind whatsoever" in referring to business establishments is indicative of an intent by the Legislature "that the term 'business establishments' was used in the broadest sense reasonably possible." (*Id.*, at p. 468.)

Although in *Burks* the court determined the word "business" included both commercial and noncommercial entities, its application in the broadest sense was unnecessary because the enterprise and activities involved there were both commercial. However, this was not the situation in *O'Connor* v. *Village Green Owners Assn.*, *supra*, 33 Cal.3d 790.

In *O'Connor*, the Supreme Court was confronted with whether a nonprofit owners association, charged with the responsibility of enforcing an age restriction on residency in a condominium complex, was a business establishment within the meaning of the Unruh Act. After quoting with approval the discussion in *Burks* as to the scope of the phrase "all business establishments of every kind whatsoever" the court compared the original version[8] of the bill presented to the Legislature with the final version enacted as the

---

[8]The original version of the bill read in part: "All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or associations." (*O'Connor* v. *Village Green Owners Association*, *supra*, 33 Cal.3d 790, 795, fn. 5; *Burks* v. *Poppy Construction Co.*, *supra*, 57 Cal.2d 463 at p. 469, fn. 3.)

Unruh Act. The Supreme Court found the broadened scope of "business establishments" in the final version of the bill "indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute 'business establishments' of every type whatsoever." (33 Cal.3d at pp. 795-796.)

Moreover, the Supreme Court further concluded that "[n]othing in the language or history of [the] enactment [of the Unruh Act] calls for excluding an organization simply because it is nonprofit." (*Id.*, at p. 796.) Although the Supreme Court found the owners association had "businesslike attributes" to come within the scope of "business establishment," we construe this to mean that the association fits both the commercial and non-commercial aspects of the meaning of "business establishment." Here, the same situation exists. There are allegations showing that defendant has certain "businesslike attributes."

Despite this, defendant argues that any construction of the Unruh Act to bring the Boy Scouts within the meaning of "business establishment" would constitute an infringement of its rights of privacy and free association as a membership organization. The "governing principle," defendant asserts, is found in the following dissenting opinion of Mr. Justice Douglas in *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163, 179-180 [32 L.Ed.2d 627, 641, 92 S.Ct. 1965]: "The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or women who his or her associates must be. The individual can be as selective as he desires. So the fact that the Moose Lodge allows only Caucasians to join or come as guests is constitutionally irrelevant, as is the decision of the Black Muslims to admit to their services only members of their race."

▇▇▇ Taking this principle literally as "governing" would afford protection to the most flagrant form of discrimination under the canopy of the right of free association. The answer is, of course, that those with a common interest may associate exclusively with whom they please *only* if it is the kind of association which was intended to be embraced within the protection afforded by the rights of privacy and free association. (See Note, *Association, Privacy and the Private Club: The Constitutional Conflict* (1970) 5 Harv.C.R.-C.L. L.Rev. 460, 466-467.) "The character and extent of any interference with the freedom of association must be weighed against the countervailing interests." (Note, *Sex Discrimination in Private Clubs* (1977) 29 Hastings L.J. 417, 422.)

 Accordingly, these constitutional provisions only restrain the Legislature from enacting antidiscrimination laws where *strictly* private clubs or institutions are affected. (See, e.g., *Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d 463, 471; *Stout* v. *Young Men's Christian Ass'n. of Bessemer, Alabama* (5th Cir. 1968) 404 F.2d 687; *Nesmith* v. *Young Men's Christian Ass'n. of Raleigh, N.C.* (4th Cir. 1968) 397 F.2d 96; *National Org. for W., Essex Ch.* v. *Little L. Base., Inc.* (1974) 127 N.J.Super 552 [318 A.2d 33, 66 A.L.R.3d 1247].)

 Our function here is succinctly stated in *Kramer* v. *Municipal Court* (1975) 49 Cal.App.3d 418, 424 [122 Cal.Rptr. 672]; "Our duty in interpreting the . . . statute is not limited to avoiding a construction which makes it clearly unconstitutional. [Citation.] It goes further: if possible, the statute *must* be construed so that 'constitutional difficulties' will not even arise." (Italics added.)

 To avoid the constitutional infirmity argued by defendant, criteria have been established to determine, in the context of the Unruh Act and similar statutes, whether a group is private or public. (See *Nesmith* v. *Young Men's Christian Assn. of Raleigh, N.C., supra,* 397 F.2d 96, 98-102; *Cornelius* v. *Benevolent Protective Order of Elks* (D.Conn. 1974) 382 F.Supp. 1182; *Wright* v. *Cork Club* (S.D.Tex. (1970) 315 F.Supp. 1143.)

In determining whether an establishment is in fact a private club, there is no single test. (*Nesmith* v. *Young Men's Christian Assn. of Raleigh, N.C., supra,* 397 F.2d at p. 101.) However, "[s]electivity is the essence of a private club." (*Wright* v. *Cork Club, supra,* at p. 1151.) " 'Where there is a large membership or a policy of admission without any kind of investigation of the applicant, the logical conclusion is that membership is not selective.' " (*Nesmith* v. *Young Men's Christian Ass'n. of Raleigh, N.C., supra,* 397 F.2d at p. 102.) An organization "with no limits on its membership and with no standards for admissibility, is simply too obviously unselective in its membership policies to be adjudicated a private club." (*Ibid.*)

Since the essence of a private club or organization is exclusivity in the choice of one's associates, we find this approach ensures that private organizations remain protected. However, those entities which are not in fact private must comply with the mandate of the Unruh Act.

■ Moreover, we find that to allow an organization to offer its facilities and membership to the general public, but exclude a class of persons on a basis prohibited by law would be contrary to the public policy expressed in the Unruh Act. Although our research discloses no California cases directly on point, cases decided under the federal and sister states' public accommodations statutes are persuasive here. For example, in *Tillman* v. *Wheaton-Haven Recreation Assn.* (1973) 410 U.S. 431, 438 [35 L.Ed.2d 403, 409, 93 S.Ct. 1090], a nonprofit recreational association open to all white residents in a certain area was found not to be a private club exempt from the Public Accommodation Law (Title 11 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000a et seq.) because it had " 'no plan or purpose of exclusiveness.' " Similarly, in *Sullivan* v. *Little Hunting Park* (1969) 396 U.S. 229, 236 [24 L.Ed.2d 386, 392, 90 S.Ct. 400], a community park open to all area residents who were not black was held not be a private club since "[i]t is open to every white person within the geographic area, there being no selective element other than race." In *National Org. for W., Essex Ch.* v. *Little L. Base., Inc., supra,* 127 N.J.Super. 522 [318 A.2d 33], a membership organization for boys was held to be a public accommodation under New Jersey's public accommodation law. There, the court said: "Little League is a *public* accommodation because the invitation is open to children in the community at large, with no restriction (other than sex) whatever." (318 A.2d at pp. 37-38.)

We therefore conclude that the concept of organizational membership per se cannot place an entity outside the scope of the Unruh Act unless it is shown that the organization is truly private.

The Legislature's intent to include organizations such as the Boy Scouts within the scope of the Unruh Act is also found in the enactment of the Fair Employment Practices Act and the Fair Housing Law. Both these civil rights acts were passed in 1959 during the same session as the Unruh Act. Unlike the Unruh Act, however, these two acts specifically excluded nonprofit entities. For example, the Fair Employment Practices Act[9] contained an express exclusion for social clubs, and fraternal, charitable, educational or religious associations or corporations not organized for profit. The Fair Housing Law[10] also specifically excluded housing operated by nonprofit religious, fraternal, or charitable associations or corporations.

We therefore conclude that the term "business establishments," consistent with the Legislature's intent to use the term in the broadest sense rea-

---

[9]Formerly Labor Code, section 1413, subdivision (d), enacted by Statutes 1959, chapter 121, section 1, page 2000; now Government Code, section 12926, subdivision (c).

[10]Formerly Health and Safety Code, section 35710, subdivision (2), enacted by Statutes 1959, chapter 1681, section 1, page 4074; now Government Code, section 12927.

sonably possible, includes all commercial and noncommercial entities open to and serving the general public. Accordingly, we hold the Boy Scouts, of which the defendant is a part, is a business establishment within the meaning of the Unruh Act.

## C. EXCLUSION OF PLAINTIFF ON THE BASIS OF HIS SEXUAL PREFERENCE OF HOMOSEXUALITY IS NOT PERMISSIBLE UNDER THE UNRUH ACT.

The primary purpose of the Unruh Act is to compel recognition of the equality of all persons in the right to the particular service offered by an organization or entity covered by the act. (See *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 738 [180 Cal.Rptr. 496, 640 P.2d 115], citing *Piluso* v. *Spencer* (1918) 36 Cal.App. 416, 419 [172 P. 412].)

After reviewing the common law origin, the legislative history and past judicial interpretations of the act and its statutory predecessors, our Supreme Court in *In re Cox, supra,* 3 Cal.3d 205, 216, held that the Unruh Act bars all types of arbitrary discrimination. The Act's reference to particular bases of discrimination—"sex, color, race, religion, ancestry or national origin"—is illustrative rather than restrictive. (*Ibid.*; Accord: *Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d at p. 732; *O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 794.)

Moreover, the statute's focus on the individual precludes the exclusion of persons based on a generalization about the class to which they belong. For example, the statutory protections of the act bar exclusionary policies directed against (1) homosexuals (*Stoumen* v. *Reilly, supra,* 37 Cal.2d 713, 716); (2) reputed immoral persons (*Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734 [227 P.2d 449]); (3) children (*Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d 721); (4) students (59 Ops.Cal.Atty.Gen. 70 (1976)); and (5) those who associate with blacks (*Winchell* v. *English, supra,* 62 Cal.App.3d 125, 128-130).

Nor can an exclusion be justified only on the ground that the presence of a class of persons does not accord with the nature of the organization or its facilities. (See, e.g., *Marina Point, Ltd.* v. *Wolfson, supra,* 30 Cal.3d at p. 741.) However, an organization may "promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided." (*In re Cox, supra,* 3 Cal.3d at p. 217.)

Here, plaintiff asserts that he was expelled from membership in the Boy Scouts, and excluded from "Scouter" status therein, on the claim that

he is not a good moral example for younger scouts due to his sexual preference of homosexuality.

In *Stoumen* v. *Reilly, supra,* 37 Cal.2d 713, 716, our Supreme Court recognized that the Unruh Act prohibits the exclusion of a person on the basis of homosexual status. Also, in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co., supra,* 24 Cal.3d 458, 475, the court held that section 453, subdivision (a) of the Public Utilities Code prohibits arbitrary employment discrimination against homosexuals, although homosexuals are not specified in the statutory language. Thus, we conclude that the Unruh Act prohibits arbitrary discrimination against homosexuals.

Defendant argues, however, that the enforcement of the Unruh Act against it would violate the supremacy clause of the United States Constitution, article VI, clause 2.[11] Defendant contends that the Boy Scouts of America is authorized under the charter granted it by Congress in 1916 (see 36 U.S.C.A. § 21 et seq.) to employ membership requirements based on sex, religious beliefs, political beliefs and other criteria the organization has historically applied.

This argument rests on the premise that Congress, in granting the federal charter, intended to authorize the Boy Scouts to practice discrimination against homosexuals.

Contrary to the position of defendant, the language of the federal charter demonstrates the opposite intent: "The name of the corporation created by this chapter shall be 'Boy Scouts of America,' and by that name it shall have . . . power . . . to make and adopt by-laws, rules and regulations *not inconsistent with the laws of the United States, or any State thereof . . .*" (36 U.S.C.A. § 22; italics added.) Thus, there is no supremacy clause problem. Moreover, the Unruh Act is not in conflict with the Boy Scouts' charter. (See, e.g., *Perez* v. *Campbell* (1971) 402 U.S. 637, 644 [29 L.Ed.2d 233, 239, 91 S.Ct. 1704].)

We therefore hold that the plaintiff has stated a cause of action for violation of the Unruh Act.

---

[11]United States Constitution, article VI, clause 2 provides in part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Accordingly, the judgment in favor of defendant is reversed and the trial court is directed to overrule the demurrer of defendant.

Schauer, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied November 2, 1983, and respondent's petition for a hearing by the Supreme Court was denied January 6, 1984. Mosk, J., did not participate therein.