[No. B001663. Second Dist., Div. Four. Mar. 17, 1986.]

ROTARY CLUB OF DUARTE et al., Plaintiffs and Appellants, v. BOARD OF DIRECTORS OF ROTARY INTERNATIONAL et al., Defendants and Respondents.

1042

**COUNSEL**

Carol Agate, Sanford K. Smith and Fred Okrand for Plaintiffs and Appellants.

Carol S. Boyk, Evelyn Balderman Hutt, Lorraine L. Loder, Susan Schwartz and Blanch Bersch as Amici Curiae on behalf of Plaintiffs and Appellants.

Darling, Hall & Rae and Wm. John Kennedy for Defendants and Respondents.

## OPINION

**McCLOSKY, J.**—Incredibly, 14 years before the start of the 21st century and 210 years after the signing of the Declaration of Independence we still find ourselves having to write an opinion defending the right of American women to equal opportunity in a secular organization of approximately 20,000 clubs with more than 900,000 members.

Specifically, we are called upon to decide whether the Board of Directors of Rotary International (Board) may lawfully revoke the charter of the Rotary Club of Duarte (Duarte) and terminate its membership in Rotary International (International) because Duarte admitted women into its club.

To do this we must decide whether the male-only-membership policy of International violates the Unruh Civil Rights Act (Unruh Act) (Civ. Code, § 51).[1] Also presented for resolution in this case is the question of whether International's policy of excluding women from club membership violates article 1, section 8 of the California Constitution.[2]

International, a nonprofit organization incorporated in the State of Illinois, is the association of local Rotary clubs worldwide. Each individual Rotarian is a member of his local club, not of International. These local clubs are, in turn, members of International which is headquartered in Evanston, Illinois. In August 1982, approximately 19,788 local clubs existed throughout the world. Membership in these clubs totaled approximately 907,750 men.

---

[1]Civil Code section 51 provides: "This section shall be known, and may be cited, as the Unruh Civil Rights Act. [¶] All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, or national origin."

[2]Article 1, section 8 of the California Constitution provides: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin."

International defines Rotary as "an organization of business and professional men united worldwide who provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world." (1981 Manual of Proc., p. 7; 1978 Manual of Proc., p. 7.)[3]

The purposes of International are "[t]o encourage, promote, extend and supervise Rotary throughout the world" and "[t]o co-ordinate and generally direct the activities of Rotary International." (Art. II of the International Const., 1981 Manual of Proc., p. 239, 1978 Manual of Proc., p. 241.)

Membership in local Rotary clubs is limited to men. (Art. IV, § 3 of the International Const., 1981 Manual of Proc., pp. 239-240, 1978 Manual of Proc., pp. 241-242; art. II of Bylaws of International, 1981 Manual of Proc., p. 249, 1978 Manual of Proc., p. 251; art. V of the Club Const., 1981 Manual of Proc., p. 303, 1978 Manual of Proc., p. 305.) The "classification principle" utilized by International, with certain exception, limits the number of members from each classification of business or profession within the community that can be admitted into active membership in a local Rotary club.[4]

---

[3]On our own motion we have augmented the record on appeal to include the Los Angeles Superior Court file pursuant to California Rules of Court, rule 12(a).

Pursuant to a written "Stipulation Regarding Certain Undisputed Facts and Related Portions of the Record" certain documentary evidence including International's 1975, 1978, and 1981 manuals of procedure, the deposition of Herbert A. Pigman, General Secretary of International, the seven-volume Rotary Basic Library and International publication No. 501 was admitted into evidence.

International's manual of procedure is the authoritative statement of Rotary practices and principles. It is updated and reprinted every three years after the meeting of the council on legislation. The council on legislation meets triennially and constitutes the legislative body of International. (Art. VIII, § 6 of the International Const., 1981 Manual of Proc., pp. 241-242, 1978 Manual of Proc., p. 244.)

[4]Section 3 of article IV of the International Constitution which is entitled "Membership" provides:

"Section 3—*Composition of Clubs.* [¶] (a) A Rotary club shall be composed of men with the qualifications hereinafter provided and no club shall be qualified for membership in Rotary International unless the qualifications of its active members are as follows: [¶] They are adult male persons of good character and good business or professional reputation, and [¶] (1) engaged as proprietor, partner, corporate officer, or manager of any worthy and recognized business or profession; or [¶] (2) holding an important position in an executive capacity with discretionary authority in any worthy and recognized business or profession; or [¶] (3) acting as the local agent or branch representative of any worthy and recognized business or profession having charge of such agency or branch in an executive capacity; and [¶] personally and actively engaged in the respective businesses or professions in which they are classified in the club and having their places of business or residence located within the territorial limits of the club. [¶] In the event an active member of a club, after having been an *active* member of one or more clubs for five or more years, ceases to have his place of business or residence within the territorial limits of the club, he may retain his membership in the club provided his new place of business or residence is located within the corporate limits of the city in which the club is located or within the territorial limits of an immediately

Each club that is admitted to membership by International and which accepts the certificate of membership "accepts, ratifies and agrees to be bound in all things, not contrary to law, by [the] constitution and the by-laws of Rotary International, and amendments thereto, and to faithfully observe the provisions thereof." (Art. IV, § 4 of the International Const., 1981 Manual of Proc., p. 240; 1978 Manual of Proc., p. 242.)

Duarte is located in Rotary District 530. Rotary districts are geographical territories in which adjacent local Rotary clubs are grouped for administrative reasons of International. Each district has a district governor who acts as International's representative in the field. (1 Rotary Basic Library, Focus on Rotary, p. 81.)

In 1977, Duarte admitted Donna Bogart, Mary Lou Elliot, and Rosemary Freitag as active regular members of Duarte in contravention of the constitution and bylaws of International. Duarte had been experiencing membership problems and decided that its membership growth goals could best be reached by allowing qualified women to join it as it believed that in its small community there were more women than men leaders in the business and professional sector.

After complying with its own notice and hearing requirements, International, acting through its Board, revoked Duarte's charter and terminated its membership in International.

On January 8, 1979, Duarte, Elliott and Freitag filed an amended complaint for injunctive and declaratory relief against the Board, Rotary District 530, Paul G. Bryan, the district governor for Rotary District 530 for the 1977-1978 fiscal year, Oliver Batcheller, the district governor for Rotary District 530 for the 1978-1979 fiscal year, and numerous Doe defendants.[5]

---

adjoining club.

"(b) There shall be not more than one active member in each classification of business or profession, excepting the religion, news media and diplomatic service classifications, and excepting the provision for additional active members as provided in the by-laws.

"(c) The by-laws of Rotary International may provide for kinds of membership in addition to active membership in Rotary clubs to be designated as senior active, past service, and honorary membership and shall prescribe the qualifications for each." (1978 Manual of Proc., pp. 241-242; see also 1981 Manual of Proc., pp. 239-240.)

[5]While Bogart was named as a party plaintiff in the original complaint for declaratory relief filed on June 20, 1978, she was not named as a party plaintiff in the amended complaint and is not a party to this appeal.

On May 21, 1982, at plaintiffs' request, the entire action as to defendant Oliver Batcheller was dismissed with prejudice.

On December 3, 1982, Paul Bryan was dismissed as a defendant pursuant to stipulation of counsel.

In their amended complaint, plaintiffs sought (1) to enjoin the defendants from declaring Duarte's charter null and void, from compelling delivery of the charter to any representative of International, and from enforcing those provisions of the International constitution and bylaws restricting membership in local clubs to men and (2) a declaration that the acts of defendants violated the Unruh Act and article 1, section 8 of the California Constitution.

The matter was tried before the court sitting without a jury. On March 21, 1983, judgment was entered in favor of defendants and against plaintiffs. Concurrently with the filing of the judgment, the trial court filed a statement of decision as requested by plaintiffs pursuant to Code of Civil Procedure section 632.

In denying plaintiffs' requests for injunctive and declaratory relief the trial court found that International, Duarte, and Rotary District 530 are not "business establishments" within the meaning of the Unruh Act or organizations providing "goods, services and facilities" to its members. The trial court further found that to preclude the enforcement of International's male-only-membership policy in California would infringe upon the associational rights of many Rotarians and "would materially affect the operation of Rotary not merely outside the State of California but outside the United States." The trial court also found that plaintiffs failed to demonstrate that enforcement of the male-only-membership policy and expulsion of Duarte from International caused any damage to Duarte or to the individual plaintiffs or to women in general.

With respect to the constitutional claim of Freitag and Elliot, the trial court found that there was no nexus between International's male-only-membership policy and government action, that plaintiffs had made no claim of government action, and that "[n]o act of defendants has directly or indirectly disqualified or otherwise impeded any plaintiff or any woman from entering, or pursuing a business, profession, vocation, or employment because of sex."

DISCUSSION

I

■ The Unruh Act is to be liberally construed with a view to effectuating the purposes for which it was enacted and to promote justice. (*Koire* v. *Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195]; *Winchell* v. *English* (1976) 62 Cal.App.3d 125, 128 [133 Cal.Rptr. 20].) "As with all statutes, it must be construed in the light of the legislative

purpose and design. In enforcing the command of a statute both the policy expressed in its terms, and the object implicit in its history and background, should be recognized." (*Winchell* v. *English, supra,* 62 Cal.App.3d at p. 128.)

One of the policies underlying the enactment of the Unruh Act is the eradication of discrimination by private or public action on the basis of sex by "business establishments" in the furnishing of "accommodations, advantages, facilities, privileges, or services." (§ 51; *Koire* v. *Metro Car Wash, supra,* 40 Cal.3d at p. 36; *Winchell* v. *English, supra,* 62 Cal.App.3d at p. 128.) ■ The Unruh Act is clearly a declaration of California's public policy mandate and objective that men and women be treated equally. (*Koire* v. *Metro Car Wash, supra,* 40 Cal.3d at p. 37.)

"[B]oth its history and its language disclose a clear and large design to interdict all arbitrary discrimination by a business enterprise. That the act specifies particular kinds of discrimination—[sex], color, race, religion, ancestry, and national origin—serves as illustrative, rather than restrictive, indicia of the type of conduct condemned." (*In re Cox* (1970) 3 Cal.3d 205, 212 [90 Cal.Rptr. 24, 474 P.2d 992].)

The Unruh Act, enacted into law in 1959, emanated from and was modeled after traditional public accommodations legislation. It "expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to include 'all business establishments of every kind whatsoever.' [Citation.]" (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], cert. den., 459 U.S. 858 [74 L.Ed.2d 111, 103 S.Ct. 129].) Today, it provides in pertinent part that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments of every kind whatsoever.*" (Italics added.)

■ In *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795 [191 Cal.Rptr. 320, 662 P.2d 427], this state's highest court quoting from *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313], noted that " '[t]he Legislature used the words "all" and "of every kind whatsoever" in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of these words without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term "business establishments" was used in the broadest sense reasonably possible. The word "business" embraces everything about which one can be employed, and it

is often synonymous with "calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." [Citations.] The word "establishment" as broadly defined, includes not only a fixed location, such as the "place where one is permanently fixed for residence or business," but also a permanent "commercial force or organization" or "a permanent settled position (as in life or business)." [Citation.]' "

The *Burks* court concluded that a real estate developer engaged in the business of developing and building tract houses which were offered for sale to the public through advertisements and the display of a model home operated a business establishment within the meaning of the Unruh Act. In reaching this conclusion, the *Burks* court noted that "[t]he original version of the bill which was presented to the Legislature, in addition to affording protection in 'business establishments,' referred specifically to the right 'to purchase real property' and to other rights, such as the obtaining of 'professional' services." (57 Cal.2d at p. 469.) Then in noting that the final version of the Unruh Act as enacted into law eliminated these specific references, the *Burks* court concluded that the "deletions can be explained on the ground that the Legislature deems specific references mere surplusage, unnecessary in view of the broad language of the act as finally passed." (*Ibid.*)[6]

■ Eleven years later in *O'Connor,* the Supreme Court reaffirmed its reasoning in *Burks* stating: "The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute 'business establishments of every type whatsoever.' . . . . Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit. [Citation.]" (33 Cal.3d at pp. 795-796.)

The *O'Connor* court then went on to conclude that a nonprofit homeowners' association of a condominium development violated the Unruh Act when it attempted to enforce an arbitrary age restriction in the covenants, conditions and restrictions of the development. In concluding that the nonprofit homeowners' association was a business establishment within the meaning of the Unruh Act, the court stated: "The Village Green Owners

---

[6]On January 21, 1959, the Unruh Act was introduced to the Legislature as Assembly Bill No. 594. The original version of that bill in pertinent part provided: "All citizens within the jurisdiction of this State, *no matter what their race, color, religion, ancestry, or national origin,* are entitled to the full and equal *admittance,* accommodations, advantages, facilities, *membership,* and privileges *in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or association."* (Italics in original.)

Association has *sufficient businesslike attributes* to fall within the scope of the act's reference to 'business establishments of every kind whatsoever.' Contrary to the association's attempt to characterize itself as but an organization that 'mows lawns' for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value. Consistent with the Legislature's intent to use the term 'business establishments' in the broadest sense reasonably possible [citation], we conclude that the Village Green Owners Association is a business establishment within the meaning of the act." (*O'Connor* v. *Village Green Owners Assn.*, *supra,* 33 Cal.3d at p. 796, italics added.)

In *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712 [195 Cal.Rptr. 325, 38 A.L.R.4th 607], appeal dismissed (1984) 468 U.S. 1205 [82 L.Ed.2d 873, 104 S.Ct. 3574], Division Seven of this court reversed the judgment of dismissal entered in favor of defendant Boy Scouts after the trial court sustained its demurrer without leave to amend on the ground that plaintiff Curran had failed to state facts constituting a violation of the Unruh Act. (*Id.,* at pp. 734-735.) The *Curran* court concluded that plaintiff's complaint contained allegations showing that the Boy Scouts has certain "businesslike attributes"[7] and hence is a business establishment prohibited from arbitrarily discriminating against homosexuals in the provision of its services. (*Id.,* at p. 730.) In light of plaintiff's further allegation that he had been expelled and excluded from the Boy Scouts organization because he was a homosexual (*id.,* at p. 718), the *Curran* court, concluded that because "the Unruh Act prohibits arbitrary discrimination against homosexuals" (*id.,* at p. 734), plaintiff had in fact sufficiently pleaded a cause of action for violation of the Unruh Act. (*Ibid.*)

---

[7]In its factual statement, the *Curran* court stated that plaintiff in his complaint alleged, among other things, "that the Boy Scouts of America is the owner of the copyright of the Boy Scouts' emblem and uniform, which are franchised to retail outlets throughout the United States. It derives great financial revenues from such franchising. In addition, the Boy Scouts of America is engaged in the book publishing business and publishes and sells a variety of books throughout the United States. Furthermore, defendant maintains a retail shop in Walnut Creek, California, where it engages in extensive commercial activities." (147 Cal.App.3d at p. 719.)

In *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212], the Supreme Court after noting that the phrase "business establishments" includes "at least those facilities subject to the predecessor statute—i.e., 'place of public accommodation or amusement'" (*id.*, at p. 79) concluded that the Boys' Club of Santa Cruz, Inc. (Boys' Club) is a "'place of public accommodation or amusement' and thus a 'business establishment' covered by the Act." (*Id.*, at p. 81.) The court further concluded that in the absence of evidence demonstrating a social need for the exclusion of girls from the facility, exclusion of local girls from membership in the Boys' Club was an arbitrary form of discrimination. (*Id.*, at pp. 88-90.)

In concluding that the Boys' Club is a "place of public accommodation or amusement" the *Isbister* court explained: "The Club certainly qualifies as a 'place of amusement.' Indeed, its primary function is to operate a permanent physical plant offering established recreational facilities which patrons may use at their convenience during the hours the Club is open. [¶] Moreover, the Club is classically 'public' in its operation. It opens its recreational doors to the entire youthful population of Santa Cruz, with the sole condition that its users be male." (40 Cal.3d at p. 81.)

The *Isbister* court also noted that that nonprofit organization had some "businesslike attributes," and explained that "like the nonprofit hospital . . . cited [in *O'Connor*] as an example of a nonprofit 'business establishment,' the Club employs a substantial paid staff and 'care[s] for an extensive physical plant' used for public purposes. [Citation.] [¶] . . . . In these circumstances, the fact that its purposes and operations are not strictly commercial does not bar a conclusion that it is a 'business establishment' to which the Act applies." (40 Cal.3d at pp. 82-83, fns. omitted.)

With these legal principles in mind, we proceed to decide whether International is a business establishment. The resolution of this issue is one of law.[8]

II

In the case before us, the trial court specifically found that International, Rotary District 530 and Duarte were not business establishments within the meaning of the Unruh Act.

---

[8]We note that at the time judgment was rendered below the trial court did not have the advantage, as we do, of the subsequently decided important cases of *O'Connor, Koire, Isbister* and *Curran.*

■ The question pivotal to this appeal is whether International is a business establishment, for it was this worldwide organization that discriminated against Duarte and its female members by revoking Duarte's charter and terminating its membership in International.

In resolving this issue, however, we must also examine the function and activities of Duarte and local clubs since these are dictated by International.

### A

As stated earlier, International is a worldwide nonprofit corporate association of local Rotary clubs. It is permanently headquartered at the International headquarters building in Evanston, Illinois.

International's status as a nonprofit organization, does not preclude it from being a business establishment within the meaning of the Unruh Act. As the court in *O'Connor* stated, "Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit. [Citation.] ■ Indeed, hospitals are often nonprofit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees to those who use the facilities." (33 Cal.3d at p. 796.)

■ Like the homeowners' association in *O'Connor,* International "in reality has a far broader and more businesslike purpose." (*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d at p. 796.) Its businesslike attributes are readily apparent from a brief overview of its organizational structure as well as certain of its administrative and financial concerns.

International is administered by the Board which consists of 17 members and which controls and manages the affairs and funds of International. (Art. V, §§ 1 and 2 of the Internat. Const., 1981 Manual of Proc., p. 240, 1978 Manual of Proc., p. 242.) The officers of the organization are the "president, vice-president, other directors, general secretary, treasurer, district governors, and the president, immediate past president, vice-president and honorary treasurer of Rotary International in Great Britain and Ireland." (Art. VI, § 1 of the Internat. Const., 1981 Manual of Proc., p. 240, 1978 Manual of Proc., p. 242.)

International's principal sources of revenue "are per capita dues from clubs; convention and regional conference registration fees; charter fees from new clubs; sale of publications; subscriptions and advertising income from the magazine; license fees and royalty payments; and interest and

dividends on investments." (1981 Manual of Proc., p. 104; 1978 Manual of Proc., p. 104.)

Members of the Board, committee chairpersons and other authorized persons are reimbursed by International for expenses incurred in furthering specified International business and responsibilities. (1981 Manual of Proc., pp. 105-108; 1978 Manual of Proc., pp. 105-108.) Total reimbursement made to each district governor may not exceed the total amount of his budget appropriation. (1981 Manual of Proc., p. 106; 1978 Manual of Proc., p. 106.)

The general secretary of International is the managing officer of the organization and is its most senior full-time employee. The general secretary, together with an international staff of 350 individuals, constitutes the secretariat of International. The secretariat operates from what is known as the "Central Office" located in Evanston, Illinois and from branch offices in Switzerland, Sweden, Australia, Sao Paulo, and Japan. Rotary literature describes the secretariat "as a 'clearinghouse' for Rotary clubs worldwide, gathering, analyzing, translating, and disseminating Rotary information . . . [which] serves the officers and members of Rotary clubs, the R.I. Board of Directors, the committees, and district governors." (1 Rotary Basic Library, Focus on Rotary, p. 51.)

The central office is organized into six divisions. Rotary literature describes each of these six divisions as follows:

"1. *Administrative Services,* which serves the R.I. Board of Directors, implements legislative and other special procedures, and provides travel service for Rotary officers, committees, and personnel.

"2. *Communications,* which publishes the official magazine, assists the regional magazines, produces R.I. literature and audiovisual programs, and coordinates public relations, printing, and graphic arts operations.

"3. *Finance,* which supervises the fiscal operations of R.I. and The Rotary Foundation[9] throughout the world.

"4. *Personnel and Office Services,* which administers personnel procedures and staff development, and provides secretarial, office, translation, and printing and duplicating services.

---

[9]Rotary Foundation is a trust operated under the laws of the State of Illinois. (1981 Manual of Proc., p. 208; 1978 Manual of Proc., p. 213.)

"5. *Program Development,* which develops and implements R.I. programs, plans and manages R.I. annual conventions and other international meetings, and coordinates research activities.

"6. *Service,* which promotes 1 Rotary programs, membership growth, and provides service to district governors and Rotary clubs worldwide." (1 Rotary Basic Library, Focus on Rotary, pp. 52-54.)

Also part of the secretariat organization is the finance and investment administrator who oversees all financial operations of International including investments. The finance committee of International "develops and recommends a budget to the R.I. Board of Directors. When adopted, the budget appropriations govern expenditures. A standing committee advises the Board on all investment matters and monitors the performance of professional investment managers." (1 Rotary Basic Library, Focus on Rotary, p. 56.)

"The expense of the secretariat in Evanston, Illinois, U.S.A., and branch offices covers such items as the salaries of the employees, operating expenses of R.I. headquarters building in Evanston, and rental of branch office space, stationery, supplies, postage, express, telegraph and telephone, electronic data processing, multi-copying, printing, pamphlets distributed gratis, furniture and equipment depreciation and repairs, insurance and taxes, auditing, general expense, etc." (1981 Manual of Proc., p. 108; 1978 Manual of Proc., p. 108.)

While the organizational structure and financial concerns of International are much more extensive and complex, this brief overview clearly establishes that International is an organization which exhibits substantial businesslike attributes.

International is an organization with permanent offices throughout the world. It utilizes vast numbers of staff to manage, supervise, coordinate and direct its activities. As of 1982, it was the parent organization for approximately 19,800 member clubs as well as the guiding force for more than 900,000 Rotarians. The divisions of the secretariat's central office each play a major and critical part in the administration of the organization and are clearly reflective of a businesslike hierarchy.

Commercial attributes and advantages, too, become obvious when the functions and responsibilities of the communications division of the secretariat are scrutinized. Said division is described in Rotary literature as a "publishing house" which produces and revises a wide range of Rotary books, manuals, pamplets, and periodicals. Many publications and resource

materials are issued in a number of different languages. Additionally the communications division "plays a vital role in preparing Rotary publications and audiovisual and public relations material for distribution to clubs, districts, and a worldwide membership." (1 Rotary Basic Library, Focus on Rotary, p. 60.)

One of the specific functions of the communications division is the publication of the official magazine of Rotary which is received by nearly one-half million readers and is read by Rotarians and non-Rotarians alike. The Rotarian is published monthly in English and the Revista Rotaria is published bimonthly in Spanish. (1 Rotary Basic Library, Focus on Rotary, p. 61.)

In the United States and Canada, membership in International is conditioned upon the active, senior active, and past service members of local clubs becoming and remaining paid subscribers to the Rotarian. For clubs outside the United States and Canada, membership in International, too, is conditioned upon their members subscribing to the Rotarian or an approved regional Rotary magazine. Compliance with the condition may be excused under certain circumstances. Subscription to the Revista Rotaria is mandatory for all members of local clubs in Spanish-speaking countries. (Art. XVIII of Internat. Bylaws, 1981 Manual of Proc., pp. 296-297, see also pp. 104-105; art. XIX of Internat. Bylaws, 1978 Manual of Proc., pp. 297-298, see also pp. 104-105.)

Commercial aspects are also apparent in the manner in which International grants authorization to use the Rotary emblem.

In response to various concerns and individuals who requested permission from International to manufacture and sell articles bearing the emblem of the Rotary, the Board "agreed to the establishment of a license fee and royalty procedure for the authorization of firms and individuals to manufacture, sell or use the Rotary emblem. [¶] The board authorized and instructed the general secretary to develop such a license fee and royalty procedure, including a form of agreement and license, such procedure to provide that, in consideration of authorization granted by R.I. to firms and individuals to manufacture, sell or use the Rotary emblem or items bearing the Rotary emblem, such firms and individuals shall be required to pay to R.I. a license fee and an annual royalty on the annual gross sales of Rotary emblem merchandise." (1981 Manual of Proc., p. 150; 1978 Manual of Proc., p. 152.)

Each year International publishes an official directory "containing a list of all the clubs, the names and addresses of their presidents and secretaries, time and place of meetings, names and addresses of the officers and com-

mitteemen of R.I., and other information appropriate to such a publication." (1981 Manual of Proc., p. 171; 1978 Manual of Proc., p. 175.) While the manual of procedure purports to proscribe the use by a Rotarian of the official directory for commercial reasons, part of the official directory "is a hotel directory carrying the advertising cards of a partial list of hotels which are owned or operated by Rotarians or which are meeting places or headquarters of Rotary clubs." The directory also includes "a list of those firms which have been licensed by R.I. to manufacture and/or sell specifically approved items being the Rotary, Rotaract or Interact name and emblem." (1981 Manual of Proc., p. 171; 1978 Manual of Proc., p. 175.)

The commercial benefits engendered by the advertisement section of the official directory are obvious. We conclude, therefore, that although International is a nonprofit organization it has sufficient businesslike attributes to render it a business establishment under the Unruh Act.

### B

■ There is no doubt that there are substantial business benefits to be gained by belonging to an organization such as Rotary which is comprised of community business and professional leaders. As a matter of fact, the trial court recognized that such benefits derived from membership in Rotary but found them to be "incidental to the principal purposes of the association which are to promote fellowship for *non*-commercial, and *non*-economic objectives and to secure the voluntary uncompensated participation of business and professional men" in services and activities performed on a local, national and international level. (Italics in original.)

The trial court, however, mistakenly discounted the significance of these benefits. ■ Substantial business benefits regardless of whether they are of a primary or secondary concern must be considered when deciding whether an organization is bound by the Unruh Act.

■ Volume 1 of the Rotary Basic Library, Focus on Rotary, makes clear that the primary purpose for the formation of the Rotary movement was commercial advantage. (P. 5.)

From a discussion held among four men "came the idea of a men's club whose membership would be limited to one representative from each business and profession. Weekly meetings were to be held at each member's place of business in turn. The rotation of meetings was designed to acquaint the members with one another's vocations and to promote business."

"The earliest meetings of the 'Rotarians' were held in the name of 'acquaintance' and good fellowship, and they were designed to produce in-

creased business for each member." (1 Rotary Basic Library, Focus on Rotary, p. 2.) The men who joined were "motivated primarily by the business they expected to receive from other club members . . . . (1 Rotary Basic Library, Vocational Service, pp. 6-7.)

Further, Rotary's literature itself makes clear that "Rotary derives its name from the historic fact that the first Rotary club in Chicago rotated its meeting site to a different member's place of business each week, thus underscoring the vocational foundation of its philosophy." (See Internat. publication No. 501.)

The trial court found that the classification principle of selecting one representative from each business and profession "originated many years ago from self-seeking commercial purposes" but that the Rotary has for many years abandoned the use of the classification principle "as a device for encouraging preferential business relationships among Rotarians." We note, however, that the classification principle still exists in Rotary, and that International now states that "[t]he purpose of this 'classification' system is to ensure that the members of each club comprise a true cross-section of their community's business and professional life or endeavor." (1 Rotary Basic Library, Focus on Rotary, p. 2.)

Rotary literature states that as the organization grew, its founders began to realize that fellowship for commercial advantage and business reciprocity was not the foundation upon which the organization could endure. (1 Rotary Basic Library, Focus on Rotary, p. 2; Community Service, p. 3.) Accordingly, Rotary "deepened its purpose and developed its ideal of 'Service Above Self,' which it expects its members to carry into the marketplace, the office and factory, the community at large and into other lands." (1 Rotary Basic Library, Focus on Rotary, p. 2.)

Today, official policy promulgated by International through its Board "specifically prohibits any attempt to use the privilege of membership for commercial advantage." (1 Rotary Basic Library, Focus on Rotary, p. 2.) The mere fact, however, that the use of Rotary membership for commercial gain is proscribed in a written policy statement promulgated by the Board does not mean that commercial advantages and business benefits have in actuality ceased to flow from Rotary membership or that they are not significant motivating forces in joining local clubs. Accordingly, the value and import of the written policy, if any, can only be ascertained by measuring compliance with this proscription.

That Rotarians consider membership in a local club to have a relation to business is established by the evidence presented below. Richard Key who

was the president of Duarte at the time it was ousted from International testified that he was an assistant school superintendent and that he joined Duarte because all the superintendents he knows belong to Rotary clubs and benefited by becoming acquainted with business and industrial leaders in the community. He pays for his dues personally and then deducts them as a business expense on his tax forms. He remembered that one year he was audited, but the deduction of his Rotary dues was allowed.

William Brooks worked at the City of Hope Medical Center. He testified that he joined Duarte because the administration of the City of Hope Medical Center felt that its organization should be represented in a service club. He testified that his dues were paid by the City of Hope and that he took expenses related to his membership in Duarte as a business expense.

Kenneth Caresio, the City Manager of Duarte, in testifying expressed his reasons for joining Duarte as follows: "I felt that professionally it would give me the opportunity to meet with the business community both of our city as well as the business community in the adjacent area." He further testified that at the time he joined "the city was pushing very hard for economic development and we felt that it would help out the city." Mr. Caresio also testified that his predecessor was a member of Duarte and that city managers belonged to local Rotary clubs. He candidly stated that "it seems to be an unwritten tradition that city managers join the Rotary clubs." His dues were paid by the city.

Herbert Pigman, the general secretary of International, in his deposition, too, testified that it was a condition of his employment in International that he be a member of a Rotary club and that he deducted his dues to the Evanston Rotary Club to which he is a member as a business expense.

Dr. Jacob Frankel testified by stipulation that he is the president of California State College, Bakersfield and a member of the Rotary Club of Bakersfield. It was his belief that Rotary membership was essential for a college president to raise funds. All members of his cabinet are members of various local Rotary clubs and were encouraged to join as part of their employment. A former treasurer of the Bakersfield Rotary, Dr. Frankel noted that out of the club's 200 members only 8 or 10 paid their dues personally. The dues of all other members were paid by their companies or businesses.

This evidence leaves no doubt that business concerns are a motivating factor in joining local clubs. While Rotarians perform numerous and commendable charitable services at the local, national and international levels, the evidence establishes that there are business benefits enjoyed and capitalized upon by Rotarians and their businesses or employers.

The evidence simply does not support the trial court's finding that these business advantages are merely incidental. By limiting membership in local clubs to business and professional leaders in the community, International has in effect provided a forum which encourages business relations to grow and which enhances the commercial advantages of its members.

We therefore conclude that Duarte, too, is a business establishment within the meaning of the Unruh Act.

### III

Underlying the trial court's finding and conclusion that neither International nor Duarte is a business establishment is its finding that these organizations are private and hence not governed by the Unruh Act.

Relying on Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal. L.Rev. 260, 281, 289-290, the trial court concluded that the legislative history of the Unruh Act precludes its application to membership "in private organizations, particularly where, as here, that membership connotes substantial personal and social interactions with other members." We believe that conclusion of the trial court was erroneous.

While the Supreme Court in *O'Connor* made it clear that "[t]he broadened scope of business establishments in the final version of the bill . . . is indicative of an intent by the Legislature to include therein all formerly specified *private* and public groups or *organizations* that may reasonably be found to constitute 'business establishments of every type whatsoever'" (33 Cal.3d at pp. 795-796, italics added), that court in *Isbister* declared that the Unruh Act "does not govern relationships which are truly private." (40 Cal.3d at p. 84; fn. 14.) It described "truly private" relationships as "'continuous, personal, and social'" and which "take place more or less outside 'public view.'" (*Ibid.*, citing Horowitz, *op. cit. supra,* 33 So.Cal. L.Rev., at pp. 281, 287, 289.)

Membership in International is far from "continuous, personal and social." International's membership consists of at least 19,800 separate local Rotary clubs and is nongratuitous. Individual Rotarians are not members of International yet they are compelled to "make up" meetings they have missed at Rotary clubs elsewhere where they are not members. In fact, International is more of an organizational director, regulator and supervisor. A local Rotary club can be formed only upon the approval of International. All of its members must abide by the rules set forth by International in its constitution and bylaws. Failure of a local club to comply with said rules

could result in the revocation of its charter. Additionally, as found by the trial court, "[i]f a local club persists in an unsatisfactory level of membership, attendance, or community service, efforts are made to secure the voluntary termination of its charter." Involuntary termination of a club's charter is determined by International to become necessary at times.

With respect to local clubs, the community services performed by local Rotarians clearly take place in "public view." This is also true of most of the activities of District and International. In fact, Rotary literature states that "[e]very Rotary club must have its windows and doors open to the whole world." (1 Rotary Basic Library, Focus on Rotary, p. 69.)

While there is personal and social interaction among Rotarians, the commercial aspects of the relationship clearly preclude a conclusion that they are "truly private." Additionally, Paul Bryan, a former district governor of Rotary District 530, testified that turnover is high in local clubs. He stated that in many clubs the turnover is about 10 percent a year and that turnover is as high as 20 percent in larger clubs. The relationship among Rotarians is not "continuous, personal and social." We conclude therefore that the trial court's finding and conclusion that International and Duarte were "private" organizations immune from the remedial grasp of the Unruh Act is not supported by substantial evidence.

## IV

As "business establishments," International and Duarte are prohibited from arbitrarily discriminating in the provision of its "accommodations, advantages, facilities, privileges, or services." (§ 51.)

Because we conclude that membership in an organization constituting a business establishment is clearly an "advantage" or "privilege" under the Unruh Act, exclusion from or termination of membership arbitrarily on the basis of sex is prohibited.

Additionally, a variety of goods, privileges and services flow from membership in a local Rotary club. These include the official Rotary magazine, numerous Rotary publications, the right to wear or display the Rotary emblem and to attend "business relation conferences" wherein the Rotarian "learns management techniques that help improve his own business or professional skills" and "receives the inspiration of discussing business problems with experts in his own or related fields."

The trial court's finding that neither International nor Duarte is "an organization engaged in providing goods, services, and facilities" is therefore unsupported by substantial evidence in the record on appeal.

V

██ We next address the trial court's finding that "[t]o force Rotary International by judicial intervention to permit local clubs in California to admit women members contrary to its democratically reaffirmed male-only membership policy would be inequitable" because "such an injunction would create a substantial risk of irreparable harm to the national and international associational integrity of Rotary without conferring a commensurate or even a material economic, social or other benefit upon the plaintiff women in particular, or women in general."

A

In finding that a ruling prohibiting International from enforcing its male-only-membership restriction "would comprise a material interference with deeply felt choices of associational preference of many Rotarians" and "would materially affect the operation of Rotary not merely outside the State of California but outside the United States," the trial court stated: "The Court accepts the testimony herein of Rotary's General Secretary [Mr. Pigman] that this issue is of widespread and deep concern among Rotarians both in the United States and in widely different cultures throughout the world. The Court also accepts his testimony that the continued successful worldwide operation of Rotary is materially dependent on a delicate balance of divergent attitudes in diverse cultures, and that judicial interference with this balance, as reflected by the votes in Rotary's Council on Legislation, would risk a material and harmful disruption of the existing cooperative integrity of Rotary International both inside and outside the State of California."

We have reviewed Mr. Pigman's testimony and conclude that while it supports the trial court's finding that the male-only-membership policy is valued by a substantial majority of Rotarians throughout the world and that, as a rule that has been internally agreed upon, it has enabled the organization to work effectively on a worldwide basis, it does not support a finding that the admission of women into the local Rotary Club of Duarte would cause the downfall of the District or International or seriously interfere with Rotary's objectives.

In fact, Mr. Pigman's inability to decisively resolve the question of "what would be the impact on Rotary if a ruling prohibiting the organization from enforcing its male-only constitutional provisions," was unequivocally reflected when he testified, "It is difficult for me to conjecture or discern what might happen to Rotary International if its ability to agree upon its own

rules of procedures were to be dictated by decisions, forces external to its own operations."

Moreover, arbitrary and blatant acts of sex discrimination against the women of this state which violate the Unruh Act will not be tolerated merely because refusing to tolerate them may have an impact or effect on business establishments situated beyond our territorial boundaries.

## B

■■■ The trial court explained plaintiffs' failure to establish damages as follows: "The Court finds that plaintiffs have not demonstrated that membership in the Duarte Club prior to its explusion from Rotary comprised a substantial source of business contacts. In fact, Duarte was having difficulty attracting members. The Court further finds that the expulsion of Duarte from Rotary did not harm it as a vehicle for making business contacts. In fact the size of its membership and the vigor of its activities thereafter increased. The three female members of Duarte, *by their own admission,* did not join Duarte for professional benefits and disclaim any harm to their careers by reason of expulsion of Duarte by Rotary. The Court does not accept as true the speculation that at some time in the future their careers *might* suffer from Rotary's male-only policy. This Court is not persuaded by the evidence introduced in this case that the 'male-only' membership restriction of Rotary has deprived any women of any material or substantial economic advantage . . . ." (Italics in original.)

None of these particular findings constitutes a basis on which injunctive relief may properly be denied in this case. We have already concluded that International and Duarte are business establishments and as such they are prohibited from discriminating against members and potential members on the basis of sex.

In this case, Duarte admitted Bogart, Elliot and Freitag into membership. In revoking Duarte's charter because it admitted women into membership and refused to expel them, International's Board clearly violated the Unruh Act. ■■■ The Unruh Act proscribes not only International's direct discrimination against women but also discrimination against Duarte on account of its association with women. (See *Winchell* v. *English, supra,* 62 Cal.App.3d at p. 129.) ■■■ Moreover, as the discrimination was arbitrary, damages are presumed.

In *Koire* v. *Metro Car Wash, supra,* 40 Cal.3d 24, a majority of the California Supreme Court, in rejecting the argument that sex-based price discounts cause no injury to either men or women, declared "that by passing

the Unruh Act, the Legislature established that arbitrary sex discrimination by businesses is *per se* injurious." (*Id.,* at p. 33.) The *Koire* court noted that "[s]ection 52 provides for minimum statutory damages of $250 for *every* violation of section 51, *regardless* of the plaintiff's actual damages." (*Ibid.,* fn. omitted; italics in original.) ▮ Moreover " '[a]lthough the Unruh Act makes no express provision for injunctive relief, that remedy as well as damages may be available to an aggrieved person.' " (*Id.,* at p. 28, fn. 5, quoting *Burks* v. *Poppy Construction Co., supra,* 57 Cal.2d at p. 470.)

▮ The ill effects of discrimination against the individual as well as on society are well recognized. Our nation's Supreme Court in *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244], succinctly stated that it "has frequently noted that discrimination based on archaic and overbroad assumptions about the relative needs and capacities of the sexes forces individuals to labor under stereotypical notions that often bear no relationship to their actual abilities. It thereby both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life." (*Id.,* at p. 625 [82 L.Ed.2d at p. 476].)

### VI

International argues that forcing it to excuse compliance with the male-only-membership policy would violate the associational freedoms afforded it by the federal Constitution.

In *Roberts* v. *United States Jaycees, supra,* the United States Supreme Court ruled that application of the Minnesota Human Rights Act to prevent sex discrimination perpetuated by membership policies of the United States Jaycees, a nonprofit membership corporation, did not violate that organization's freedom of intimate or expressive association.

▮ It is well recognized that freedom of intimate association is a fundamental element of personal liberty and "because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." (*Id.,* at p. 618 [82 L.Ed.2d at p. 471].)

In discussing freedom of intimate association, the *Roberts* court noted that among the highly personal relationships that are entitled to this constitutional shelter "are those that attend the creation and sustenance of a family"— marriage, childbirth, the raising and educating of children and living with

relatives. The *Roberts* court further explained: "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. [Citations.]

"Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. [Citation.] We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent. In this case, however, several features of the Jaycees clearly place the organization outside of the category of relationships worthy of this kind of constitutional protection." (*Id.*, at pp. 619-620 [82 L.Ed.2d at pp. 472-473].)

The *Roberts* court concluded that the Jaycees was not entitled to the constitutional protection afforded by the freedom of intimate association because local chapters of the Jaycees were large in size and membership in the organization was unselective.

In the present case, the trial court found that the "primary purpose of Rotary is to encourage a fellowship among business and professional men representing a diverse cross-section of the business and professional activities within the local community" and "to promote a variety of voluntary, civic, eleemosynary, and charitable 'service' activities" on local, national and international levels. The trial court further found that membership is

selective since it "is neither solicited from nor is it available to the public generally."

In reliance on these findings, International contends, that unlike the Jaycees, it is entitled to the protection of the freedom of intimate association. We disagree.

While the classification principle—i.e., membership criteria—established by International, and by which local clubs must abide, might at first blush appear to be selective, Rotary's own literature dispels this notion. Noting that the classification principle "would seem to be a restrictive provision" International, through its literature, explains that *"its purpose is to produce an inclusive, not exclusive, membership, making possible the recognition of all useful local occupations, and enabling the club to be a true cross section of the business and professional life of the community."* (1 Rotary Basic Library, Focus on Rotary, p. 67; italics added.)

Additionally, the immense size of International and the number of Rotarians throughout the world is hardly indicative of an intimate relationship. While fellowship and service to the community play a very important part in the Rotary organization, the business benefits and commercial advantages to be gained are also clearly an inducement for the business and professional leaders of the community to join.

Additionally, Rotarians are required to attend weekly meetings. When a Rotarian misses a meeting he is required to make up that meeting by attending the meeting of another club anywhere in the world. International's own literature states that "[a]s a member of the Rotary family, [the individual Rotarian] has a universally recognized right of entry into any Rotary club meeting anywhere in the world . . . ." (1 Rotary Basic Library, Focus on Rotary, p. 68.) It follows then that that club may not, selectively or otherwise, exclude a foreign Rotarian's attendance at its meetings. The trial court itself found that "[i]nternational travel results in a material amount of club visitation by foreign Rotarians." By its own requirements, then, congeniality on a worldwide level is encouraged. From these features we conclude that International and Rotary District 530 lack the distinctive characteristics that might afford them the constitutional protection to compel local Rotary clubs to exclude women. (468 U.S. at p. 621 [82 L.Ed.2d at p. 474].)

With respect to the freedom of expressive association the *Roberts* court stated: "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may . . . try to interfere with the internal organization or affairs of the group. [Citation.] By requiring the Jaycees to admit women as full voting

members, the Minnesota Act works an infringement of the last type. There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate. [Citation.]

"The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." [Citations.] . . . ." (468 U.S. at p. 623 [82 L.Ed.2d at pp. 474-475].)

The *Roberts* court then concluded "that Minnesota's compelling interests in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms" (*Id.,* at p. 623 [82 L.Ed.2d at p. 475]) and that the state interest was being furthered by the least restrictive means as the Jaycees failed to demonstrate that the Minnesota Act "imposes any serious burdens on the male members' freedom of expressive association." (*Id.,* at p. 626 [82 L.Ed.2d at p. 477].)

A similar conclusion is mandated in this case. To the extent that International's freedom of expressive association is involved, infringement of this right is clearly justified by this state's compelling interest in abolishing sex discrimination by business establishments.

Like the Minnesota Act, the Unruh Act "does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." (*Id.,* at p. 623 [82 L.Ed.2d at p. 475].) It does not require International to change its objectives or to open membership to the entire public at large, nor does it invalidate its "inclusive, not exclusive," selective membership requirements. (1 Rotary Basic Library, Focus on Rotary, p. 67.)

We therefore conclude that application of the Unruh Act to International does not abridge its freedom of intimate or expressive association.

## VII

The trial court noting that "[t]here has been neither a showing [nor] a claim that Illinois law has been violated, [nor] have plaintiffs demonstrated any economic or other reasons why, under well-settled constitutional prin-

ciples of interstate comity, the law of Illinois should not be the sole test of that corporation's internal membership rules" concluded "that these extraterritorial considerations alone are sufficient to decline granting the drastic injunctive relief sought by plaintiffs."

Whether or not International's male-only-membership policy violates Illinois law is not controlling in this case. Nothing we have said prevents, or can prevent, International from adopting or attempting to enforce membership rules or restrictions outside of this state or lawful restrictions inside this state. Neither notions of interstate comity nor the full, faith and credit clause of the federal Constitution, however, compel us to permit International, a foreign corporation, to enforce its male-only-membership policy in this state in violation of the Unruh Act. Neither 5 Witkin, Summary of California Law (8th ed. 1974) Constitutional Law, section 289, pages 3579-3580 nor *Order of Travelers* v. *Wolfe* (1947) 331 U.S. 586 [91 L.Ed. 1687, 67 S.Ct. 1355, 173 A.L.R. 1107], upon which the trial court relied compel a contrary conclusion. Consequently, we conclude that extraterritorial concerns do not justify the denial of injunctive relief.

### VIII

The trial court found that because "Duarte admitted women to membership in knowing violation of Rotary's membership restriction" it was guilty of unclean hands thereby precluding the granting of injunctive relief.

The clean hands doctrine has no applicability in this case. "The maxim 'he who comes into equity must come with clean hands' should not be invoked when the act sought to be enjoined is against public policy." (*Jomicra, Inc.* v. *California Mobile Home Dealers Assn.* (1970) 12 Cal.App.3d 396, 402 [90 Cal.Rptr. 696].)

Public policy in this state strongly supports the abolition of discrimination on the basis of sex. This policy is effectuated, in part, by the Unruh Act which expressly proscribes sex discrimination by business establishments. (*Koire* v. *Metro Car Wash, supra,* 40 Cal.3d at p. 36.) Insofar as the act sought to be enjoined in this case is arbitrary sex discrimination violative of the Unruh Act, the trial court abused its discretion in denying injunctive relief on an unclean hands theory.

### IX

"Granting or denying an injunction is within the sound discretion of the trial court and will be upheld on appeal absent an abuse of discretion.

Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence." (*Jessen* v. *Keystone Savings & Loan Assn.* (1983) 142 Cal.App.3d 454, 458 [191 Cal.Rptr. 104].)

The injury caused and perpetuated by International's sex discrimination is both "great and irreparable" and cannot adequately be compensated by money. (See Code Civ. Proc., § 526, subds. 2 and 4.) This conclusion, together with our foregoing discussion and conclusions, establishes that the trial court abused its discretion in denying Duarte, Freitag and Elliot injunctive relief.

Rotary literature describes "The 4-Way Test" as "a yardstick for living" which "aims to encourage the ethical instincts in every person and constitutes a simple and practical guide for people of all cultures." (1 Rotary Basic Library, Vocational Service, p. 39.)

Rotary advocates application of the following four-way test to the things "we think, say or do":

1. Is it the TRUTH?

2. Is it FAIR to all concerned?

3. Will it build GOODWILL and BETTER FRIENDSHIPS?

4. Will it be BENEFICIAL to all concerned?

While the Rotary organizations are in large part very well motivated and accomplish much good, International's discriminatory policy towards women clearly violates this test and evidences International's failure to practice toward women the fairness "to all" that it preaches.

X

In light of our conclusion that International violated the Unruh Act and that injunctive relief should have been granted, we need not, and do not, decide whether article 1, section 8 of the California Constitution requires state action or whether International's male-only-membership policy violates that constitutional provision.

The judgment is reversed. The matter is remanded to the trial court with directions to enter a new and different judgment in favor of Rotary Club of Duarte mandating the Board of Directors of Rotary International and Rotary District 530 to reinstate Rotary Club of Duarte's charter thereby reinstating

it as a member of Rotary International and Rotary District 530 and permanently enjoining Rotary International and Rotary District 530 from enforcing or attempting to enforce its male-only-membership restriction against Rotary Club of Duarte.

Woods, P. J., and Shimer, J.,* concurred.

A petition for a rehearing was denied April 9, 1986, and respondents' petition for review by the Supreme Court was denied June 18, 1986.

---

*Assigned by the Chairperson of the Judicial Council.